(PRIZE AND INSTANCE COURT.)

## The JOSEFA SEGUNDA, *Carricabura et al.* Claimants.

An information under the act of the 3d of March, 1807, c. 77. to prevent the importation of slaves into the United States. The alleged unlawful importation attempted to be excused upon the plea of distress. Excuse repelled, and condemnation pronounced.

Upon a piratical capture, the property of the original owners cannot be forfeited for the misconduct of the captors in violating the municipal laws of the country where the vessel seized by them is carried.

But where the capture is made by a regularly commissioned captor, he acquires a title to the captured property, which can only be devested by recapture, or by the sentence of a competent tribunal of his own country; and the property is subject to forfeiture for a violation, by the captor, of the revenue or other municipal laws of the neutral country into which the prize may be carried.

APPEAL from the District Court of Louisiana. From the proceedings in the Court below, it appear-

ed, that the brig Josefa Segunda being Spanish pro-
perty, and on a voyage from the coast of Africa to
the island of Cuba, with a cargo of negroes, was
captured on the 11th day of February, 1818, off
Cape Tiberon in St. Domingo, by the Venezuelan
privateer, the General Arismendi On the 24th of
April following, she was seized in the river Missis-
sippi, by certain custom house officers, and conduct-
ed to New-Orleans, where a libel was filed against
her in the District Court for the Louisiana district.

The libel contained four counts. The first alle-
ged, that the said negroes were unlawfully brought
into the United States from some foreign country
in the said brig, with intent to hold, sell, or dispose
of them as slaves, or with intent that the same
should be held to service or labour, contrary to the
act of Congress in such case made and provided.

The second count alleged, that these negroes were
taken, received and transported on board the said
brig, from some of the coasts or kingdoms of Afri-
ca, or from some other foreign kingdom, place, or
country, for the purpose of selling them in some port
or place within the jurisdiction of the United States,
as slaves, or to be held to service or labour, contrary,
&c. In the third count it was charged, that the said
brig was found in some river, port, bay, or harbour
of the United States, or on the high seas, within the
jurisdictional limits of the United States, or hovering
on the coast thereof, to wit, in the river Mississippi,
having on board some negroes, mulattoes, or people
of colour, for the purpose of selling them as slaves,
or with an intent to land the same, in some port of

1820.

The Josefa
Segunda.

place within the jurisdiction of the United States, contrary, &c. The fourth allegation or count was, that one hundred and seventy-five persons of colour, not being native citizens, or registered seamen of the United States, or natives of countries beyond the Cape of Good Hope, were landed from said brig, in a port or place, situate in a State which, by law, had prohibited the admission or importation as aforesaid, to wit, at or near the Balize in the State of Louisiana, contrary, &c.

This libel was filed on the 29th of April, 1818, and on the 5th of May following, a claim was interposed by Messrs. Carricabura, Arieta & Co. merchants of the Havanna, which stated, that they were owners of the said brig, which, with the said negro slaves, was on the high seas, while pursuing a lawful voyage, captured and taken from them by a certain Rene Beluche, and the crew of the armed ship or vessel called the General Arismendi, sailing under the flag of the revolted colonies of Venezuela and New-Grenada; that the said brig put into the Balize in very great distress, and without any intention on the part of the crew, or any other person on board, to infringe or violate any law of the United States. That whatever may have been the conduct of the prize crew, or of any other persons on board, the claimants insist, that they cannot be made responsible for any of their acts, because the said brig, with her cargo, was taken from their possession unlawfully, and in violation of the law of nations, inasmuch as the captors had no legal authority to take the same; and if they had any commission, the capture

was illegal, because the privateer the General Arismendi, was armed and fitted out, or her armament or equipment increased, in a port of the United States, in violation of the laws thereof.

On this libel and claim, it appeared in evidence that the capture of the brig Josefa Segunda, with a cargo of slaves, was made off Cape Tiberon, in the Island of St. Domingo, on the 11th of February, 1818, on a voyage to the Havanna, from the coast of Africa, which she had left in the preceding month of December or January. The capture was made by a Venezuelan brig, the General Arismendi. This vessel was commissioned as a privateer, by John Baptista Arismendi, who styled himself commanding General of Venezuela, and Captain General of the Island of Marguerita. The caption of the commission was, " Republic of Venezuela ;" and it purported to have been given in the Island of Marguerita, the 1st of February, in the year 1818, and to be sealed with the great seal of the State. At the time of capture, there were from two to three hundred slaves on board ; some of these, but what number does not appear, afterwards died ; others, but how many is not stated, were sold at the Jardins de la Reine, on the south side of the Island of Cuba, in order to purchase provisions. Toward the end of the month of February, the prize master of the brig received written orders from the Captain of the privateer to conduct the prize to the Island of Marguerita ; and always steered, as he says, eastward, the winds being always ahead. The prize master had no log book on board; he wrote every day's occurrences on

a slate, effacing what had been written the day before. On the 18th of April, 1818, in the morning, the brig was boarded by a pilot, about 40 miles from the Balize, and arrived there at 4 o'clock, P. M. About 25 miles from the Balize, the brig fell in with the American ship Balize, from which no provisions were asked, but from whom he received six bags of rice. On the 24th of April, the brig was seized by the custom-house officers, and conducted to New-Orleans. On the 27th of April, 1818, Laporte, who was the agent of Beluche at New-Orleans, wrote a letter to the prize master of the brig, containing, among others, these expressions, " Maintain always your declaration of being forced into port."—" Take care that your sailors neither say, nor do any thing, which may prejudice the interest of Venezuela." The privateer, after the capture of the brig, went to Jamaica for provisions. The pilot who first boarded the brig stated, that her mainmast was sprung, her ropes were all bad, the sails not fit to go to sea ; that they were pumping the last cask of water on board. Her spars were middling, except the mainmast ; there were no provisions on board—the men were in a state of starvation—that the slaves had nothing but skin upon their bones. A witness, who was on board in her passage up the river, stated that the brig sailed equal to any thing in the river—that he would not be afraid to make a voyage in her—her tackle, ropes, &c. were as good as usual—she was pumped out but once while he was on board—they carried topsails coming up—the spars were generally good. He saw nothing in the appearance of

the crew of their having been starved. It also appeared that the agent of the claimants in New-Orleans, received letters from the owners of the brig sometime prior to her arrival at New-Orleans, and that one of the owners had arrived in that city, while this cause was depending, and before the 19th of June, 1818.

It was admitted by the claimant, that there existed an understanding between them and the captors; that the former were to render to the latter a compensation for their not interposing any claim, which was so far ascertained, that the sum which the captors were to receive, was not to be less than six, nor more than eight thousand dollars, to depend on the expense and trouble incident to the prosecution, and the repairing of the vessel; that this arrangement was made by the advice of the captor's counsel, from a conviction on his part, that they could not recover on account, as he conceived, of the illegality of the commission. It was also admitted, that the claimants were the original owners of the brig and slaves on board.

On this testimony, the District Court condemned the brig, and effects found on board, to the United States, and the cause was brought by appeal to this Court.

Mr. *C. J. Ingersoll*, for the appellants and claimants, argued, 1. That the vessel was compelled by necessity to enter the Mississippi, and, therefore, was not liable to forfeiture under the acts of Congress for suppressing the slave trade. 2. That the com-

*March 9th.*

mission of General Arismendi, under which the ori-
ginal capture was made, was unlawful, he having no
authority to issue it as Governor of the island of
Marguerita, a dependent province of the new State
of Venezuela.    The owners were, therefore, entitled
to restitution under the 9th article of the Spanish
treaty of 1795, as well as under the general law of
nations; the right of property not being changed by
a piratical seizure.ᵃ  3. But supposing it to have
been a regular capture in the exercise of the rights
of war, and supposing the captors to have entered
the waters of the United States with the intention
of violating the acts of Congress, it is insisted, that
the prize thus carried into a neutral port, before ad-
judication, cannot be forfeited *to the neutral State*
for a breach of its municipal laws committed by the
captors, without the consent or collusion of the ori-
ginal owners.    It has been repeatedly determined,
that when captures are made in violation of our neu-
tral rights, as ascertained by the law of nations, the
acts of Congress, and treaties with foreign powers,
restitution of the captured property will be decreed
by our tribunals to the original owners.ᵇ   Why?
Because it is the right as well as duty of the nation
to prevent its neutral territory and resources from
being used for the purposes of hostility by either bel-
ligerent.    It will, therefore, restore in two cases:

a *Grotius, de J. B. ac P. l.* 3. *c.* 9. *s.* 17.    *Bynk. Q. J. Pub.
l.* 1. *c.* 17.   *Valin, sur l'Ordon. l.* 3. *tit.* 9. *art.* 10.;  2 *Bro.
Civ. & Adm. Law,* 461.

   b The Divina Pastora, 4 *Wheat.* 52. 55. and the cases cited in
note.(*a*)

First, where the capture is made within its territorial limits; and, secondly, when made by a vessel armed or re-equipped in its ports. The same principles apply where the captor violates the laws of police, or the revenue laws of the neutral State. The infringement of the one is as injurious to that State, and to the captured belligerent, as the infringement of the other. The injury to the original owner is equally great, whether the privateer was fitted in the neutral ports, or is permitted to carry his prizes into those ports for sale. The *spes recuperandi* is gone; and will the neutral sovereign condescend to avail himself, as against an innocent friend, of the forfeiture incurred by the misconduct of the enemy of the latter? The captor cannot sell; he cannot completely devest the original owner of his remaining right to the captured property before its lawful condemnation: shall he then be permitted to do so by smuggling, or even by attempting, or barely intending to smuggle it in a neutral port? It is the well established doctrine of public law, that belligerents have no right to sell or dispose of their prizes in a neutral port, before they are judicially condemned in a competent Court of the captor's country; unless in case of necessity, or when the right is secured to them by treaty, or by the express permission of the neutral government; or in case of the intervention of peace.[a] If, then, the captor has not such an

a Bee's *Adm. Rep.* 263. The Flad Oyen, 1 *Rob.* 114. The Purissima Conception, 6 *Rob.* 45. The Schoone Sophie, *Ib.* 138. 2 *Bro. Civ. & Adm. Law*, 255. 1 *Peters' Adm. Dec.* 24. 2 *Peters' A. D.* 345. The Kierlighett, 3 *Rob.* 82. Wheel-

1820.

The Josefa
Segunda.

interest in his uncondemned prize, as will enable him to dispose of it by sale to another, how can he be said to have such an interest as will enable him to forfeit it to the neutral State for a breach of its municipal laws? This is a novel question, both here and in the European Courts of prize. It is indeed settled, that the Prize Court may dismiss the claim of a citizen, violating the law of his own country where the court sits; or of an ally or neutral violating the treaties between his own country and that of the Court; and that it may dismiss the libel of a captor (of the country where the Court sits,) for a collusive capture, or for a violation of the laws of trade. But the moment the neutral Court, in the present case, ascertained that this was a capture *jure belli*, or piratical, it had nothing to do but to restore it to the original possessor. The captor had not such a proprietary interest as rendered him capable of forfeiting it to the United States. The first case of a forfeiture in the Prize Court for a breach of municipal law, which is reported, is that of the Walsingham Packet:[a] that was the case of a British packet, retaken from the enemy, wherein a claim was given for the cargo as the property of British and Portuguese merchants, and resisted on the part of the captors, on the ground that such trade was prohibited by act of Parliament. Here the jurisdiction of the

right v. Depeyster, 1 *Johns. Rep.* 471. 481. 2 *Valin. Com. Sur l'Ord.* 272. and seq. *Vattel, l.* 4. c. 2. s. 22. *Marten's Law of Nations*, 323. *Wheat. on Capt.* 262.

a 2 *Rob.* 64.

Court, with respect to the thing recaptured, was unquestionable; and Sir W. Scott rejected the claim on account of the claimants *own personal* misconduct, reserving the ultimate question, to whom the property should be condemned. In the case of the Etrusco,[a] it was subsequently determined, that condemnation in such cases should be, not to the captors, but to the crown. In the case of the Recovery,[b] Sir W. Scott determined, that the claim of a neutral could not be rejected in a Prize Court of the captor's country, for violating the municipal law of that country. Why? Because, as to him, it was a mere Court of the law of nations, though as to British subjects it was also a Court of municipal law. As to him, the offence was merely *malum prohibitum*; as to British subjects, it was *malum in se*: and they had no right to complain if they were punished for it in any tribunal of their own country, however constituted. The cases of the Bothnea and the Jahnstaff,[c] and of the George,[d] in this Court, were also cases where the Court had undoubted prize jurisdiction, and the original owner being an enemy, could interpose no claim. The captor had been guilty of collusion with the public enemy, and had assisted him in violating the non-importation act. The Court, therefore, dismissed his libel, and condemned the property to the United

a 4 *Rob*. 256. Note.
b 6 *Rob*. 341.
c 2 *Wheat*. 169.
d *Ib*. 278.

States.  A similar observation is applicable to the case of the Venus,[a] in which the joint claim of a citizen, and an alien, to the vessel, was rejected, on the ground that the former had made a false oath, in order to obtain a register, whereby she became liable to forfeiture under the registry act.  The District Court of Louisiana, beside its Circuit Court powers, may exercise jurisdiction as a Prize Court, or an Instance Court of Admiralty.  In neither of these capacities could it take cognizance of the present case.  Not as a Prize Court: for the jurisdiction belonged exclusively to the Venezuelan tribunals.  Nor as an Instance Court of the law of nations : since, as such, its decree could only be for restitution to the captors or to the original owners, according as our neutrality had or had not been violated.  Nor as an Instance Court of municipal law, could it condemn the captured property of a friend before it had been declared good prize by a competent prize tribunal ; unless perhaps where the owner or his agent had subjected his property to such a forfeiture by an offence against the municipal law, consummated before the capture.  The proper course of proceeding, where there is no collusion between the captor and the former owner, is to punish those captors who attempt to violate our municipal laws in the same manner as those who violate our neutrality ; that is, by dispossessing them of their prizes, and restoring them to the original proprietors.  Such was the conduct of Holland on a similar omission, as

a 8 Cranch, 253.

stated by Bynkershoek.[a]   It is true, that he animad-   1820.
verts upon these ordinances of the States General ;   The Josefa
but his reflections will be found to be solely applica-   Segunda.
ble to his own favourite notion of the right of belli-
gerents to carry their prizes into neutral ports, and to

[a] The passage of Bynkershoek here alluded to is as follows :
He begins by observing : " Although it be lawful, on national
principles, to carry a prize into neutral territory, and there to
sell it, if the captor thinks proper, laws have, nevertheless,
more than once been made to the contrary." He then pro-
ceeds : " The States General, on the 9th of August, 1658, is-
sued an edict, by which they ordered, that no foreign captor
who might be compelled by stress of weather, or some other
reasonable cause, to bring his prize into the ports of this coun-
try, should presume to sell any part of it, or even to break
bulk, but that he should inform the bailiff of the place of his
arrival, who, having placed a guard on board of the ship, should
keep a strict watch over her, until her departure : inflicting,
moreover, a discretionary penalty, and a fine of one thousand
florins, on any one that should assist in unloading, or purchase
any thing out of her.   To which edict, the said States Gene-
ral, on the 7th of November, in the same year, enacted a sup-
plement, by which it was ordered, that no prize ship should be
brought into the port itself, but merely into the outer roads,
where she might be sheltered from danger, and that nothing
should be unladen or sold out of her ; *and if any one should act
to the contrary, the prize should be restored to the former owner,
as though it had never been taken, and the captor himself should be
detained, and his own vessel seized and confiscated.*   The remain-
der of the edict merely confirms that of the 9th of August above
mentioned.   Whether those edicts were extorted from the
States General by fear, or by any other cause, I do not know ;
but lest they should hereafter militate against national princi-
ples, we must declare, that we rather believe them to have
been temporary than perpetual laws."   *Bynk. Q. J. Pub. L.*
1. *p*. 121. *of Mr. Duponceau's translation.*

sell them there, which has long since been exploded. The force of this historical example is not diminished by his criticism, founded, as it is, upon a false theory. In the case now before the Court, there can be no objection to restitution, on the ground of the traffic in which the original owners were engaged, being prohibited by the laws of their own country ; for it is notorious, that Spain tolerates the trade. The principle, therefore, applied by the Lords of Appeal in England, to an American slave trader, in the case of the Amedie,[a] does not apply to this case. And Sir Wm. Scott, since the determination of the Lords, has decided, in the case of a Swedish vessel, that he would not condemn, because there was no positive proof, that Sweden had prohibited the trade, although it did not appear, that this State had ever sanctioned it, or that her subjects had been in the habit of carrying it on.[b] If it be said, that the condemnation rests on the act of Congress, and that this act is general in its terms, and makes no distinction as to the manner in which vessels violating the law may have been brought into our waters ; it is answered, that, like all other penal laws, it must receive an equitable and liberal construction, and cannot be applied to cases of distress, or other cases of *vis major.*

The *Attorney General,* contra, argued principally upon the facts, to show, that the capture was collu-

a *Acton's Rep.* 240. *Edinburgh Rev. Vol.* 16. *No.* XXI. *p.* 436. *Wheat. on Capt.* 227.

b The Diana, *Dodson,* 95.

sive, and that, consequently, the Court had jurisdiction to condemn the property to the United States, in a case where the captor and captured had combined in a scheme of fraud to defeat the execution of our municipal laws. He insisted, that even if this were not the fact, that the captors had by possession, *jure belli*, such a title to the property as rendered it liable to confiscation for any breach of our laws by the captors. Their title could only be devested by recapture, or by the sentence of a competent prize Court of their own country ; and how improbable it was that such Court would dispossess them of it, is shown by the proofs and the pleadings in this cause, by which it appears, that the property was Spanish, and, therefore, liable to condemnation in the Prize Courts of Venezuela. The establishment of a contrary doctrine by the Court, would furnish an effectual recipe by which all our laws of trade might be violated with impunity; since it would be extremely difficult in many cases to show, that the capture was collusive, and in case of detection in the attempt to smuggle, the claimant would have nothing to do but to throw the blame upon the pretended captor, whilst in case of success, he would reap the fruits which might attend it. However ingeniously contrived such a scheme might be, it was the duty of the Court to penetrate through it, and when detected, to visit it with the penalty of confiscation.

Mr. Justice LIVINGSTON delivered the opinion of the Court, and after stating the facts, proceeded as follows : The third count of the libel is the only one

that has any bearing on the present case.    It alleges a violation óf the seventh section of an act of Congress, prohibiting the importation of slaves into the United States, after the first day of January, in the year 1808, and which passed the 3d of March, 1807.

By this section it is enacted, " That if any ship or vessel shall be found, from and after the first day of January, 1808, in any river, port, bay, or harbour, or on the high seas, within the jurisdictional limits of the United States, or hovering on the coast thereof, having on board any negro, mulatto, or person of colour, for the purpose of selling them as slaves, or with intent to land the same in any port or place within the jurisdiction of the United States, contrary to the prohibition of this act, every such ship or vessel, together with her tackle, apparel, and furniture, and the goods or effects which shall be found on board the same, shall be forfeited to the use of the United States, and may be seized, prosecuted, and condemned, in any Court of the United States having jurisdiction thereof.    And the proceeds of all such ships and vessels, their tackle, apparel and furniture, and the goods and effects on board of them, which shall be so seized, prosecuted, and condemned, shall be divided equally between the United States and the officers and men who shall make such seizure, or bring the same into port for condemnation, and the same shall be distributed in like manner, as is provided by law for the distribution of prizes taken from an enemy: provided that the officers and men to be entitled to one half of the proceeds aforesaid,

shall safe-keep every negro, mulatto, or person of colour, found on board of any ship or vessel so seized by them, and deliver them to such persons as shall be appointed by the respective States to receive the same," &c.

It is not denied, that the brig Josefa Segunda, shortly before her seizure, had been hovering on the coast of the United States, having on board a large number of persons of the description of those whose importation into this country is prohibited by the act: nor can there be any doubt, from the situation and circumstances under which she was found, and the manner in which she came within the jurisdictional limits of the United States, which appears to have been a voluntary act on the part of the prize master, that there is at least *prima facie* evidence of an intention to dispose of these people as slaves, or to land them in some port or place within the jurisdiction of the United States.

The claimants, aware of the necessity of accounting for circumstances, which, unexplained, could not but prove fatal to their interests, contend, in the first place, that the coming into the Mississippi was a matter of necessity, produced by the perilous situation of the vessel, and the famishing condition of the people on board : and that, therefore, neither she nor her cargo can be obnoxious to the provisions of the act of Congress. If the claim be not sustained on this plea ; it is insisted,

In the next place, that the capture being illegal or piratical, the original owners cannot be affected by any of the acts of the prize crew ; and,

In the third place, it is asserted, that the vessel having been ransomed, and taken out of the hands of the captors, the claimants are restored to all their original rights, unimpaired by any acts on the part of the former.

Each of these claims for restitution will now be examined.

When any act is done, which of itself, and unexplained, is a violation of law, and a party to extricate himself, or his property, from the consequences of it, resorts to the plea of necessity or distress, the burthen of proof is not only thrown upon him; but when the temptation to infringe the law is great, and the alleged necessity, if real, can be fully and easily established, no Court should be satisfied with any thing short of the most convincing and conclusive testimony. The proofs before us, are so far from being of this character, that we look in vain for testimony of any serious disaster having befallen this vessel in her voyage from the Island of Cuba, to the Mississippi,—or for a calamity of any kind, which might not have been averted or prevented, had the master seriously and honestly endeavoured to reach the Island of Marguerita, which is now pretended to have been her real port of destination. That neither he, nor his employer, should have any great solicitude for the arrival of the prize at Marguerita, is easily accounted for, when it is recollected that this island, as well from its small extent, being not more than forty miles in length, and perhaps not more than half as broad, as from the scantiness and poverty of its population, could afford but a wretched, if

any market at all for slaves; while at New-Orleans, each of them would produce the extravagant and tempting sum of one thousand dollars. It has not escaped the observation of the Court, that the General Arismendi, made the passage from Marguerita to the place of capture off the Island of St. Domingo, in the short space of nine days; for the owner's letter of instructions to the Captain bears date at Marguerita on the 2d day of February, 1818, and on the 11th of the same month, the capture was made; and yet with the important fact before us, it is seriously contended, that a voyage which had just been made in nine days, could not be performed back again in six weeks. This is a possible case; but we ought not to be expected on slight grounds to believe that a vessel after leaving the Island of Cuba, in the latter end of February, should, on the 18th of April following, be found, not only several miles farther from her destined port than at the time of sailing, but that she had pursued this circuitous route in search of provisions: a story so improbable could hardly, under any circumstance, be entitled to belief; but it becomes absolutely incredible, when so many ports, more contiguous, and where supplies might easily have been obtained, were passed in her way to the Balize, without a single effort to procure a supply at any of them. Why not go to Kingston, in Jamaica, which was in the neighbourhood of the place where the capture was made, and to which port, the privateer went after making the capture? Her not going there can be accounted for on no supposition other than that of her being well suppli-

1820.
The Josefa
Segunda.

ed with provisions at the time of her leaving Cuba. It is vain then to urge a plea, which is contradicted by the internal evidence of the case. If, however, it can be made out, that an attempt were really made to reach Marguerita, which was frustrated by adverse winds, or by any one of those disasters which so frequently occur on the ocean, or that the Josefa was forced by stress of weather so very far from the track of a direct voyage to that island, the claimant might still contend, that their plea of necessity had been made out. But, on this subject, there is an impenetrable obscurity, which it was their duty to remove. What winds, or what weather were encountered, we are not informed. No log book, from which alone, accurate and safe knowledge might be derived, is produced. A journal of that kind was not even kept, a circumstance which, of itself, excites a suspicion, which none of the testimony in the cause is calculated to dispel. But it is not necessary to pursue this inquiry farther, or to take notice of several minor circumstances which are relied on, and which so far from making out a case of real distress, only serve to confirm the view which has already been taken of the other evidence, and leave no reasonable doubt of the whole story being a fiction ; or that the want of provisions, if real, at the time of seizure, was produced by a voluntary protraction of the voyage for the purpose, and with the intent of violating the law on which the present libel is founded. If, on testimony so vague, so contradictory, and affording so little satisfaction, this Court should award restitution, all the acts of Congress which

have been passed to prohibit the importation of slaves into the United States, may as well be expunged from the statute book ; and this inhuman traffic, for the abolition of which the United States have manifested an early and honourable anxiety, might, under the most frivolous pretexts, be carried on, not only with impunity, but with a profit which would keep in constant excitement the cupidity of those who think it no crime to engage in this unrighteous commerce. In the execution of these laws, no vigilance can be excessive, and restitution ought never to be made, but in cases which are purged of every intentional violation, by proofs the most clear, the most explicit and unequivocal.

But the claimants, not relying exclusively on the plea of necessity, contend, that the capture being piratical, and by a vessel having no commission, they ought not to be injured by any acts of the prize master which may be deemed infractions of the laws of the United States.

It would, indeed, be unreasonable and unjust, to visit upon the innocent owners of this property, the sins of a pirate ; and were this allegation made out, the Court would find no difficulty in making the restitution which is asked for. But is it so ; was the General Arismendi a piratical cruizer ? The Court thinks not. Among the exhibits is a copy of a commission, which is all that, in such a case, can be expected, which appears to have been issued under the authority of the republic of Venezuela. This republic is composed of the inhabitants of a portion of the dominions of Spain in South America, who have

been for sometime past, and still are, maintaining à contest for independence with the mother country. Although not acknowledged by our government as an independent nation, it is well known that open war exists between them and his Catholic Majesty, in which the United States maintain strict neutrality. In this state of things, this Court cannot but respect the belligerent rights of both parties ; and does not treat as pirates, the cruizers of either, so long as they act under, and within the scope of their respective commissions.    This capture, then, having been made under a regular commission of the government of Venezuela, the captors acquired thereby a title to the vessel and cargo, which could only be devested by recapture, or by the sentence of a Prize Court of the country under whose commission the capture was made.    The Courts of neutral nations have no right to interfere, except in cases which do not embrace the present capture.    The captors, therefore, at the time of the violation of our laws, must be regarded as the lawful owners of the property, and as capable of working a forfeiture of it, by any infraction on their part of the municipal regulations of the United States. , The property, in the present case, not only belonged, at the time,, to the captors, in virtue of the capture which they had made, but it is evident from the testimony and admissions in this cause, that it was owned at the time of capture by an enemy, and that a condemnation in a Prize Court of Venezuela was inevitable.

As little foundation is there for. resting a claim to restitution on the ransom, which it is alleged took

place, of this vessel and cargo.   This ransom, whether real or pretended, whether absolute or contingent, (about which, doubts may well be entertained,) cannot affect the rights of the United States.   The forfeiture having attached before any ransom took place, could not be devested by any act between parties, conusant as these were, not only of the fact that a seizure had taken place for a violation of law, but that legal proceedings had been instituted, and were then carrying on, to obtain a sentence of condemnation founded on such violation.

Decree affirmed, with costs.